696 A.2d 1102

**In re ADOPTION/GUARDIANSHIP NO. 95195062/CAD IN THE CIRCUIT COURT FOR BALTIMORE CITY.**

**No. 1678, Sept.Term 1996.**

Court of Special Appeals of Maryland.

July 18, 1997.

444

Daniel H. Weiss, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

C.J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee, BSDSS.

Leonard M. Schwartz, Baltimore, on the brief, for appellee, Lester P.

Marianna I. Burt, Baltimore, on the brief, for appellees, Catherine, David, Joseph, Victor and Grace P.

Argued before MURPHY, C.J., HOLLANDER, J., and GARY S. GASPAROVIC, Judge, Specially Assigned.

HOLLANDER, Judge.

The six children of Janine P., appellant, were removed from her custody in 1990. Some six years later, The Baltimore City Department of Social Services ("the Department"), appellee, filed a petition for guardianship with the right to consent to adoption or long-term care short of adoption. After a hearing held in August 1996, the Circuit Court for Baltimore City granted the petition. Appellant has timely noted her appeal, and presents the following questions for our review:

I. Was the evidence legally sufficient to justify terminating the parental rights of the natural mother?

II. Did the trial court err by failing to make specific findings of fact?

III. Did the trial court err by failing to afford counsel the opportunity to make closing argument?

IV. Did the trial court err by admitting hearsay evidence?

We shall answer the second and fourth questions in the affirmative. Therefore, we shall vacate the judgment and remand the matter to the circuit court to make specific factual findings in accordance with the applicable statutory and evidentiary criteria. Although the third issue has not been preserved for our review, the court, on remand, should permit the parties to present closing arguments. In light of our holding, we need not address the first issue.

### Factual Background

Janine P. and her late husband had six children during their troubled marriage: Lester P., born November 23, 1983; Catherine P., born June 11, 1985; David P., born June 10, 1986; Joseph P., born August 18, 1987; Victor P., born June 15, 1989; and Grace P., born May 18, 1990. The family had lived in Washington, D.C. until May 2, 1990. On that date, which was just two weeks before Grace's birth, Ms. P. left her abusive husband and moved to Baltimore with her children.

Ms. P. had intended to live in Baltimore with her father. When she arrived in Baltimore, however, she discovered that her father had moved out of state. Because her strained relationship with other family members precluded her from living with them, Ms. P. moved to the House of Ruth, a Baltimore shelter for victims of domestic violence. The family first came to the attention of the Department in early June 1990, when a worker at the shelter reported that two of Ms. P's children wandered away from her and had almost been hit by a car.

Ms. P. and her children were referred to the Department's Intensive Family Services program ("IFS"). A team consisting of a social worker and a parent aide visited Ms. P. at the shelter on June 11, 1990, arriving soon after Ms. P. learned of her husband's sudden, unexpected death.[1] In response to the situation, the IFS team provided Ms. P. with bereavement counseling.

The IFS's report at the time of its first intervention with the family detailed the children's myriad developmental and behavior problems. Lester, age six at the time, demonstrated a fear of abandonment whenever his mother left the room, dropping to the floor and curling into a fetal position. He also had a speech deficit. Catherine, age five when the family was first evaluated, also displayed a fear of abandonment, banging her head against the wall when her mother left the room, and becoming fearful or panicky when her mother discussed activities that would not include her. She rarely spoke, but when she did her speech was unintelligible. David, then age four, was inappropriately aggressive toward strangers and destructive of property. Joseph, age three in June 1990, was "extremely withdrawn" and had a "very flat affect." He hid behind furniture, cried when his mother left the room, and rarely spoke. Victor, one year old at the time, did not respond to smiles or attempts to interact with him, nor to a rattle he was given. Similarly, Grace, then two months old,

---

1. The death certificate indicates that Mr. P. died from multiple gunshot wounds.

did not seem to respond normally to faces. Additionally, in June 1990, Ms. P. did not express affection toward her children or reassure them. The IFS's initial report also described the condition of the family's room at the House of Ruth and the children's hygiene as "deplorable."

Ms. P. and the IFS team entered into a service agreement on June 25, 1990, which provided that Ms. P. was to arrange for child care, evaluations for the older children, and enrollment of the children in school or pre-school, as well as to normalize the family's routines by creating household rules and chore assignments for the children. Pursuant to the agreement, the IFS team provided home-based counseling on stress, time, and financial management and parenting skills, transportation to medical appointments made by the IFS team, and child care for the children who remained at home during those appointments. At trial, Ms. Evans, a social worker assigned to the case, testified that Ms. P. did not cooperate with arranging child care, even though it would have been provided at no cost to her, or with arranging evaluations for her children. Nor did she initially attempt to enroll her children in school. Further, the Department felt she did not make efforts to provide organization and structure through household rules and chores.

With the assistance of the Department, Ms. P. rented an apartment. Oddly, Ms. P. brought with her from the House of Ruth bags of used sanitary napkins and diapers; rather than throwing them away as she had agreed, she stored them under a bed. Ms. Evans testified that after Ms. P. had been living in her home for a week, she could smell the odor from this refuse at the front door. Additionally, Ms. P. appeared severely depressed, and failed to supervise her children. She also did not purchase groceries regularly, and had to be reminded to buy food, although she received welfare benefits and food stamps. Moreover, the Department bought furniture for the home, including beds and bedding for the children, but after one or two weeks in the home, Ms. P. still had not prepared the children's beds. Rather, the children all ap-

peared to sleep with Ms. P. in her bed or on the floor in her room.

Because of Ms. P.'s continued inability to care for her children, and due to her mental condition, the Department removed the children from her care on August 3, 1990 and placed them with three paternal aunts who resided in the Maryland suburbs of Washington, D.C. At the time, the children still had behavioral and developmental problems. Lester and David were placed with Renee M. At the time, Lester was six and a half; he was extremely withdrawn and rarely spoke or interacted with other children. His psychological evaluation placed his functioning in most areas at three years below his actual age. David, then four, still wet the bed and sometimes wet himself while awake. Catherine and Joseph were placed with Vanessa B. Both children were very withdrawn; Catherine refused to talk and Joseph refused to look at anyone. Victor and Grace were placed with Gwendolyn B. Neither of the youngest children appeared to respond normally to stimulation.

As Ms. P. was severely depressed when the Department removed the children, her caseworker urged her to seek mental health treatment. She was admitted to the psychiatric ward at Maryland General Hospital, and had inpatient treatment for 30 days. The treating psychiatrist at Maryland General diagnosed her with an adjustment disorder and possible latent schizophrenia. When appellant agreed to seek outpatient mental health care, the hospital released appellant at her request. She did not pursue follow-up care, however.

On May 13, 1991, the children were adjudicated children in need of assistance ("CINA"),[2] and remained in the care of

---

**2.** Maryland Code (1974, 1995 Repl. Vol), § 3–801 of the Courts and Judicial Proceedings Article ("C.J."), defines "child in need of assistance" as "a child who requires the assistance of the court because ... (2) His parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and his problems...."

their aunts.[3] Following that hearing, Ms. P. physically attacked the social worker in the courthouse, and was arrested for assault and resisting arrest. The May 13, 1991 order adjudicating the children CINA initially granted Ms. P. supervised visitation. The court later suspended Ms. P.'s visitation until she completed mental health counseling and attended parenting classes.

Because Ms. P. was unable to visit her children, the Department sought telephone visitation for her. Ms. P. was to telephone the children from the offices of the Department. The telephone visitation was later suspended. Ms. P. called Victor and Grace's child care center at inappropriate times, and the child care center requested that she stop calling. Similarly, the children's paternal aunts opposed the telephone calls, because Ms. P. demanded assurances from the children of their love, and the calls distressed the children.

The Department proposed a second service agreement, aimed at helping Ms. P. to take the steps necessary to reunite her with her children. Ms. P. initially refused to sign the agreement, but eventually she executed it, after repeated letters and meetings with her children's caseworker. Ms. P. took an eight-week parenting course in 1993. The course was designed for parents of infants to three-year-olds. By the time appellant took the course, however, only the youngest child was under the age of three.

Ms. P.'s mental health treatment proved uneven. Appellee conceded that she never completed the required course of therapy ordered by the court as a condition of visitation and eventual reunification. She explained that after signing the second service agreement, she sought treatment at the Liberty Community Mental Health Center; the hospital records indicate that she was in treatment from November 5, 1991

---

3. In regard to the CINA proceedings, a psychiatric evaluation of Ms. P. was conducted by Ivan W. Laurich, M.D., on April 25, 1991. He stated that Ms. P.'s "personality liability is seen to preclude her from providing minimally adequate care for her children...." This report is discussed, *infra.*

until October 16, 1992, when she was discharged because she moved out of the service area. Ms. P. also claimed she sought treatment at Sinai Hospital; its records reflect that she was seen only for an evaluation on October 11, 1993, by Anne Holman, LCSW, and for one therapy session. Thereafter, Ms. P. canceled or failed to attend therapy sessions at Sinai Hospital. Ms. Holman wrote in a letter to the children's caseworker, "Ms. P. is not an appropriate candidate for counseling because she has no insight into her problems. She has stated she doesn't need counseling."

A letter dated September 26, 1994 from Dr. Riva Novey, M.D., stated:

In accord with our conversation of last Thursday, September 22, 1994, I don't believe that continued sessions with me would be useful to you. In my letter of August 15, 1994 I made it clear that the only way I could help you would be to determine whether visits with your children could be explored in the near future. However, you tell me that what you need is a letter stating that you have completed a period of therapy and recommending that your children be returned to you as soon as possible. As I have explained, I am unable to do that and therefore, it is not worth your while to make the effort to get to my office.

On June 14, 1995, Ms. P. was evaluated by the Adult Outpatient Program of Community Psychiatry at Johns Hopkins Bayview Medical Center. Subsequently, she attended six therapy sessions there. A letter from Johns Hopkins Bayview, signed by Joan Moskowitz, M.S., and Gerard Gallucci, M.D. concluded: "No additional treatment is seen as necessary."

At the time of the hearing in August 1996, the evidence revealed that the children were all doing remarkably well. They were taking dance classes together, attending church together, where they sing in the choir, and all visited their paternal grandmother's home regularly on Sundays. They appear to have formed strong attachments to their aunts. Evidence was also presented that the children's academic

performance was good. Lester had received a Presidential citation for educational excellence. Catherine and Joseph were both on the honor roll.

At the conclusion of the hearing, the trial court said:

I need to follow the statutory guidelines which, of course, specify that the best interests of the child is what is at stake and that I must find by clear and convincing evidence that it would be in the best interests of the child to terminate the natural parent's rights, and I believe that in this case that burden has been satisfied.

I appreciate, Ms. P., your effort to essentially get your children back, but on the other hand, I think in some respects you ought to feel yourself very fortunate because, at least based on the evidence, it appears that the children have been placed in very nurturing and stable and loving environments.

We're talking about six children, all siblings, all of whom have been placed with different families, two children each with a different family, and the evidence was quite clear and convincing that strong bonding has been formed between the children and each of those families, and I think that the ability of these foster care parents to provide for the children and to give them what they need is rather clear.

Reviewing the evidence and the criteria and considerations listed in the statute, again, I find by clear and convincing evidence that the best interests of all six children would be served by termination of parental rights and allowing the Department to proceed with its current plan.

## Discussion

### I.

In decisions regarding the termination of parental rights, the best interest of the child has long been the guiding standard. *In Re Adoption No. 10941*, 335 Md. 99, 112, 642 A.2d 201 (1994); *In Re Adoption No. A91–71A*, 334 Md. 538, 561, 640 A.2d 1085 (1994). Indeed, the child's welfare is of " 'transcendent importance'." *In Re Adoption No. A91–71A*,

334 Md. at 561, 640 A.2d 1085 (quoting *Dietrich v. Anderson,* 185 Md. 103, 116, 43 A.2d 186 (1945)). Termination of parental rights, however, implicates the fundamental constitutional right to raise one's own child. Because this right "is so fundamental . . . it may not be taken away unless clearly justified." *In Re Adoption No. 10941,* 335 Md. at 112, 642 A.2d 201; *see also Santosky v. Kramer,* 455 U.S. 745, 759, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) ("When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it.") The Court of Appeals has long recognized the gravity of the decision to terminate a person's legal status as a child's parent. In *Walker v. Gardner,* 221 Md. 280, 284, 157 A.2d 273 (1960), the Court said:

> [A]doption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.

█ As termination of parental rights involves two strong but often conflicting interests, the Legislature has provided a detailed statutory scheme that must be satisfied before a parent's rights may be terminated. Maryland Code (1957, 1991 Repl.Vol. & 1996 Supp.), Family Law Article ("F.L."), § 5–313. In these proceedings, the State bears the heavy burden of proving, by clear and convincing evidence, that termination of a parent's rights serves the best interests of the child. *In Re Adoption No. 09598,* 77 Md.App. 511, 518, 551 A.2d 143 (1989).

F.L. § 5–313 is singularly important here. For convenience, we shall set forth the most relevant portions of it:

**Guardianship; adoption in general.**

(a) *In general.*—A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights as to the child and that:

\* \* \*

(2) in a prior juvenile proceeding, the child has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child;

\* \* \*

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court **shall consider:**

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community;

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give

significant weight to any incidental visit, communication, or contribution;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

(d) *Considerations following juvenile adjudication.*—(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court **shall consider** the factors in subsection (c) of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family; or

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical,

mental, or emotional health, even though the natural parent is physically and financially able.

(Italics in original; boldface supplied.)

 It is a well settled principle of statutory construction that use of the word "shall" makes a provision mandatory, unless the context of its use indicates a contrary intent. *In Re Adoption No. A91–71A,* 334 Md. at 559 n. 5, 640 A.2d 1085. F.L. § 5–313(c) expressly makes mandatory the trial court's consideration of the statutory factors, because it provides that "the court shall consider...." *See also In Re Adoption/Guardianship Nos. CAA 92–10852 and CAA 92–10853,* 103 Md.App. 1, 10, 651 A.2d 891 (1994) (stating, "In determining what is in the best interest of a child, the court is *required* to consider an array of factors detailed in subsection (c) of 5–313.") (Emphasis supplied.) So important are these statutory considerations that, on review, we cannot be left to speculate as to whether the trial court has fulfilled its obligations. Thus, in *In Re Adoption No. 09598,* 77 Md.App. 511, 518, 551 A.2d 143 (1989), we said: "Section 5–313 *requires* that the court determine whether it is in the best interest of the child to terminate the natural parent's rights as to the child *by making findings of fact as to each factor of required consideration* listed under Section 5–313(c) and (d)." (Emphasis supplied.); *See also In Re Adoption/Guardianship No. 87A262,* 323 Md. 12, 590 A.2d 165 (1991). Indeed, in considering each factor under F.L. § 5–313, the court must even make findings of "the non-existence of facts where appropriate...." *In Re Adoption No. 2428,* 81 Md.App. 133, 139 n. 1, 567 A.2d 139 (1989). *See also In Re Adoption/Guardianship Nos. CAA 92–10852 and CAA 92–10853,* 103 Md.App. at 24, 651 A.2d 891 (1994) (noting that chancellor was required to note on the record its conclusion that it had considered the factor, even though it found the factor irrelevant).

In this case, the trial court's only specific findings were that "strong bonding has been formed between the children and each of [the foster] families," and that the paternal aunts and their families were able to provide for the children's needs.

The chancellor acknowledged that he "need[ed] to follow the statutory guidelines," and said he "[r]eview[ed] the evidence and the criteria and considerations listed in the statute"; we have every confidence that the chancellor did do what he said he did. Nevertheless, this is an area of the law for which the chancellor is required to address specifically all of the factors in F.L. § 5-313(c) and (d).

Despite the unequivocal, mandatory language of the statute and the case law applying it, the Department inexplicably asserts that "[t]he court is not required to make findings on the individual considerations relating to the children's best interest by clear and convincing evidence." Interestingly, appellee's assertion is at odds with the position it advanced in March 1997, when the Department submitted to this Court a Motion for Remand, asking us to return the case to the circuit court "for the entry of express findings of fact upon the record." In its motion, the Department essentially conceded that F.L. §§ 5-313(c) and (d) require express findings, and that the court below did not make the necessary findings. Although the motion was denied, there is nothing in our denial indicating that we reached the merits of appellee's request.

Appellee also relies on *In re Adoption/Guardianship No. 87A262*, 323 Md. 12, 590 A.2d 165 (1991), to support its current assertion that specific findings by the trial court as to the statutory criteria are not necessarily required. There, the Department of Social Services of Baltimore County appealed from the denial of a termination petition. The Department took the position that the trial court's failure to make specific findings of fact for each statutory factor constituted reversible error. The Court of Appeals, however, affirmed the *denial* of the petition, stating:

> We repeat that, as a general rule, the court should make findings of fact as to each item listed in section 5-313(c) in a proceeding to terminate parental rights. In the instant case, however, we do not find the court's failure to make more specific, item-by-item findings reversible error. We believe that the legislative requirement of consideration of the factors itemized in section 5-313(c) and (d) demonstrates

the intent that the utmost caution should be exercised in any decision to terminate parental rights. *In cases where parental rights are terminated, it is important that each factor be addressed specifically not only to demonstrate that all factors were considered but also to provide a record for review of this drastic measure.* To reverse a denial of termination of parental rights because the trial judge failed to itemize his factual findings, however, is to allow the statute to be used as a sword by the DSS to sever the family ties it was designed to shield.

*Id.* at 20, 590 A.2d 165 (emphasis added).

Appellee argues that because the Court affirmed the denial of the petition, notwithstanding the lack of specific factual findings rendered by the trial court, it follows that findings are not necessarily required when the petition has been granted. Appellee's reliance on *In Re Adoption/Guardianship No. 87A262* is misplaced. The Department has overlooked the critical distinction between a decision that grants termination and one that denies it; the standard simply cannot be the same in both situations. We ask, rhetorically, how the Department can compare a decision to deny termination with one that grants termination.

Moreover, in *In re Adoption/Guardianship No. 87A262,* the chancellor's failure to make findings of fact on all the statutory factors was consistent with the burden upon the Department to establish, by clear and convincing evidence, that it is in the best interests of the child to terminate the parent's rights. Like the defendant in a criminal case, the parent is entitled to "put the State to its proof." Thus, we cannot equate the chancellor's abbreviated review of the statutory factors when it denies such a petition with an abbreviated review when it *grants* such a petition; if the trial court finds even a single factor dispositive in a decision to *deny* the petition to terminate parental rights, then the chancellor has, in effect, determined, based on that factor, that the State has failed to carry its burden. If the court omitted to address all the factors, but its decision as to the one factor is found clearly erroneous on

review, the appellate court can remand the case for further proceedings regarding the remaining factors.

It is also noteworthy that a decision affirming the denial of the petition does not preclude the State from later bringing another petition to terminate parental rights. For example, in *In re Adoption/Guardianship No. 87A262,* the chancellor found that the Department had not yet proven that efforts at reuniting the parents with the child had failed. The Court specifically noted, however, that "if genuine efforts at reunification continue to be unsuccessful, termination of parental rights at a later date may be appropriate." *Id.* at 23, 590 A.2d 165.

Such is not the case when the chancellor *grants* the petition to terminate the parent's rights. A mistake in the process would irrevocably deprive the parent of a fundamental constitutional right. It is for this reason that every procedural safeguard must be carefully followed. Thus, the applicable statute has been construed to require express findings of fact with regard to each statutory factor, before a decision granting a petition to terminate parental rights may be sustained.

As an alternative, appellee exhorts us to delve into the record and make our own findings of fact, in order to rectify the chancellor's failure to do so. Appellee urges that,

> [i]n a case in which the evidence were [sic] more closely balanced, the trial court's failure to articulate its findings might indeed require a remand for that purpose. In this case, however, the trial court's ultimate finding as to the children's best interest is more than amply supported by clear and convincing evidence as to each of the statutory considerations.

The Department painstakingly detailed in its brief all of the evidence presented at the hearing that it contends overwhelmingly demonstrated that, on the merits, the court did not err. We have recounted much of that evidence here.

We are mindful of the concerns of many children's advocates who are understandably critical of inordinate delays

in resolution of these painful cases. Surely, these cases warrant swift and careful attention, because when a child's status remains in "limbo," the child often suffers.[4] Nevertheless, we cannot yield to appellee's request. In *In re Adoption/Guardianship No. 87A262*, 323 Md. at 20, 590 A.2d 165, the Court made clear that required findings of fact in a termination of parental rights case are essential, so that an appellate court can effectively review this "drastic measure." Accordingly, we have no choice but to vacate the judgment and remand the matter to the circuit court, so that it may articulate its findings, based on the evidence, with respect to all of the statutory criteria.

We hasten to add that while the trial judge recognized that the termination proceedings concerned six children, and concluded that the best interests of all six required termination, he did not separately address the interests of each child. On remand, the chancellor should make findings regarding the best interests of *each* child, as each child is his or her own person, with distinct needs and interests. The factors and findings with regard to a child removed from a parent during infancy, for example, may contrast markedly with the findings regarding a child who is removed from a parent at an older age. Indeed, Lester had his own counsel, apparently because, at some point during his foster care placement, his interests were not aligned with those of his siblings. This brings into sharp focus the point that the circumstances of each child who is the subject of an adoption/guardianship proceeding must be analyzed individually.

## II.

 Appellant challenges the admission in evidence of three documents relating to her mental health, on the ground that

---

**4.** Indeed, this Court denied appellee's motion to remand, with the hope that we could avoid further delay. For the reasons set forth herein, that is, unfortunately, not possible. Nevertheless, when the Department anticipates an appeal, and counsel for the Department believes the trial court has failed to make the necessary factual findings, the Department should consider submitting a timely request to the circuit court to make specific findings.

they are hearsay. Maryland Rule 2–517 provides that an objection "shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Appellant failed to object to the admission of two of those documents—one from Liberty Community Mental Health Center and the other from Sinai Hospital. Therefore, the question of the admissibility of these two documents is not preserved for our review. *Kovacs v. Kovacs,* 98 Md.App. 289, 306–07, 633 A.2d 425 (1993), *cert. denied,* 334 Md. 211, 638 A.2d 753 (1994); Md. Rule 8–131(a).

In contrast, on hearsay grounds, appellant objected to the admission of the psychiatric report prepared by Dr. Ivan W. Laurich, who was then associated with the Juvenile Court Medical Service of the Circuit Court for Baltimore City. The report was originally ordered by the court for use at the CINA hearing, and was based on the doctor's examination of appellant in April 1991. The report contains Dr. Laurich's impressions of Ms. P.'s behavior and his psychiatric diagnosis of her. Portions of the document also contain quotes of remarks that Ms. P. allegedly made to Dr. Laurich during the evaluation. Further, Dr. Laurich did not testify. Undoubtedly, the Department introduced it to establish the truth of its contents. The report is hearsay, and appellee has not presented us with an exception to the hearsay rule that renders the report admissible in evidence.[5]

Appellee argues to us that the medical report was admissible because it satisfied one of two exceptions to the hearsay rule—either Maryland Rule 5–803(b)(3) or (6). In our view, neither of these exceptions is applicable. Maryland Rule 5–803(b)(3) provides:

*Then Existing Mental, Emotional, or Physical Condition.*—A statement of the declarant's then existing state of

---

5. We also observe that the document dates from 1991, and thus the information regarding Ms. P.'s mental health is rather remote in time. Even were we to conclude that the report was otherwise admissible, it may have been of limited relevance to Ms. P.'s present ability to care for her children.

mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or the declarant's future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

 This exception is completely inapplicable to most of the report. In this context, Dr. Laurich is the "declarant," but the statements do not pertain to Dr. Laurich's then existing state of mind. To the contrary, the document was offered to prove the truth of the matters asserted by Dr. Laurich concerning his opinion of Ms. P.'s mental health and capacity to care for her children.

 Maryland Rule 5–803(b)(6) is also inapplicable. It provides:

*Records of Regularly Conducted Business Activity.*—A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The business records exception "represent[s] legislative recognition that if records are reliable enough for the running of a business (or a government agency), they are trustworthy enough to be admissible at trial, particularly when one considers the practical difficulty of proving the specific facts con-

tained in many of these records." Joseph F. Murphy, Jr. MARYLAND EVIDENCE HANDBOOK, § 804 at 418 (2d ed.1993).

As we have observed, the report was prepared when Ms. P. was evaluated in anticipation of a CINA hearing. It had nothing to do with the "running" of the Juvenile Court Medical Service of the Circuit Court for Baltimore City. Although hospital records often are admitted under this exception, the kind of information at issue here is qualitatively different. This report constitutes the opinion of an expert who was directed to evaluate appellant and opine about her mental health. Plainly, as a matter of fundamental fairness, Ms. P. was entitled to cross-examine the doctor in order to challenge his opinion.

Further, even when material is offered under the business record exception, a custodian of records must testify in order to authenticate the records. The Department never laid a foundation to demonstrate that the proffered evidence satisfied the requirements of the business records exception; no custodian from the Juvenile Court Medical Service testified to the foundational requirements. Rather, the Department sought to admit the document after eliciting testimony from Ms. Evans, the children's social worker at the time of the CINA hearing, that it was, in fact, the report relied upon in that proceeding. In the absence of an authenticating custodian from the "business" that produced the document, the requirements of this exception were not met.

We also point out that the record does not reflect any practical difficulty in bringing Dr. Laurich to court to testify to his opinions. The fact that Dr. Laurich is retired does not make him unavailable to testify. *Cf. Bell v. State,* 114 Md. App. 480, 492, 691 A.2d 233 (1997) (stating that a party must make a good faith effort to obtain a witness before the witness can be considered unavailable).

At trial, the Department asserted only that the report was admissible under C.J. § 3–818. That section provides:

**Study and examination of child, etc.**

(a) After a petition or a citation has been filed, the court may direct the Department of Juvenile Services or another qualified agency to make a study concerning the child, his family, his environment, and other matters relevant to the disposition of the case.

(b) As part of the study, the child or any parent, guardian, or custodian may be examined at a suitable place by a physician, psychiatrist, psychologist, or other professionally qualified person.

(c) The report of the study is admissible as evidence at a waiver hearing and at a disposition hearing, but not at an adjudicatory hearing. However, the attorney for each party has the right to inspect the report prior to its presentation to the court, to challenge or impeach its findings and to present appropriate evidence with respect to it.

The matter in question was a termination proceeding. The provision relied upon by the chancellor in admitting Dr. Laurich's evaluation, therefore, does not apply to the proceeding, and the court erred in admitting the report on that ground.

 Appellee also argues that even if the court erred in admitting the report, the error was harmless, because the information it contained was cumulative to information contained in two other reports that were admitted without objection. Cumulative evidence is evidence that is substantially the same. *Alco Construction Co. v. Peachwood Dev. Corp.*, 257 Md. 269, 272, 262 A.2d 733 (1970). In this case, we do not agree with appellee's assertion that the evidence was cumulative.

Dr. Laurich's report is four pages in length and is single spaced. It detailed Ms. P.'s words and actions during the course of the examination. As we already noted, it contained the doctor's diagnosis and opinion regarding Ms. P.'s ability to care for her children. In contrast, the Liberty Medical Center document is a half-page, hand-written report that provided a diagnosis different from the one in Dr. Laurich's report. Further, it documented that Ms. P. ceased treatment at

Liberty because she moved out of the service area, but provided no opinion regarding Ms. P.'s capacity to parent her children. Similarly, the Sinai Hospital document provided neither a diagnosis nor an opinion regarding Ms. P.'s capacity to parent. It merely stated that Ms. P. had "cancelled or not shown for several appointments," and was "not an appropriate candidate for counseling...." Thus, Dr. Laurich's report is not duplicative. To the contrary, it is by far the most damning of the psychiatric reports offered by the Department, containing the most serious diagnosis and the most negative assessment of Ms. P.'s capacity to parent.

When the trial judge admitted the report, he stated, "since this is not a jury trial and it is a court trial, I will certainly be cognizant of the fact that this report prepared by Dr. Laurich was prepared by a professional who is not here subject to your cross-examination and I will keep that in mind, but it seems to me under all the circumstances ... I think that I'll admit it." As the chancellor made no express findings of fact regarding Ms. P.'s mental health, we cannot determine whether the chancellor considered the report. We conclude, however, that any reliance on this hearsay evidence would constitute error. Accordingly, upon remand, unless Dr. Laurich appears as a witness, the trial court is directed to disregard Dr. Laurich's report when making its express factual findings.

### III.

We address briefly appellant's contention that the chancellor erroneously denied her the opportunity to make closing argument. The record reflects, however, that her counsel below never asked for the opportunity to make a closing argument. She also failed to object when the chancellor, after taking a brief recess at the close of the evidence, launched into his findings without affording either side the opportunity to present final arguments.

Anticipating appellee's non-preservation defense, appellant cites *Cherry v. State*, 305 Md. 631, 506 A.2d 228 (1986) and *Covington v. State*, 282 Md. 540, 386 A.2d 336 (1978), which

held that if no objection was timely made to the failure to afford a criminal defendant the opportunity to make closing argument, the issue was not properly preserved for direct appeal. The right of a criminal defendant to make closing argument is part of the right to counsel. *Cherry*, 305 Md. at 635, 506 A.2d 228. The Court concluded:

> *Covington* clearly lights the path which may be followed by the defendant in such circumstances. It is the path leading to a plenary hearing under post conviction procedures at which the facts and circumstances surrounding the failure to protest or object can be established and the appropriate determinations made thereon. Cherry may follow that path if she so desires.

*Id.* at 644, 506 A.2d 228.

Appellant argues that because this is not a criminal prosecution, she has no collateral avenue for review. Thus, she asserts that we should overlook her waiver because of the importance of the rights involved. We decline to create an exception here to sound principles of appellate review. Nevertheless, we are confident that, on remand, the court would welcome closing arguments from counsel.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLEE TO PAY COSTS.**