834 A.2d 997

**In re CAYA B.**

Nos. 1758, 2151, 2912, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Nov. 3, 2003.

64

Mary J. Pizzo, Asst. Public Defender (Stephen E. Harris, Public Defender), Baltimore, for appellant.

Katherine R. Lasher (Legal Aid Bureau, Inc., on the brief), Riverdale, for appellee.

Argued before DEBORAH S. EYLER, SHARER and PAUL E. ALPERT (Ret., specially assigned), JJ.

PAUL E. ALPERT, Judge, Retired, Specially Assigned.

The appellant is Christine B., the mother of Caya B., a Child in Need of Assistance ("CINA").[1] The appellees are Caya B. and the Montgomery County Department of Health

---

1. *See* Md.Code (1974, 2002 Repl.Vol., 2003 Cum.Supp.), § 3–801(f) and (g) of the Cts. & Jud. Proc. Art. (defining "Child in need of Assistance" and "CINA").

and Human Services. The Juvenile Court in Montgomery County[2] granted custody and guardianship of Caya B. to her maternal uncle and his wife and declined to grant formal visitation to Christine B. Christine B. presents three arguments in this appeal,[3] which we reorder and rephrase as follows:

I. The Juvenile Court abused its discretion on September 10, 2002 when it granted custody and guardianship of Caya B. to her maternal uncle and his wife instead of to her parents, and

II. The Juvenile Court's actions on January 31, 2003 amounted to a termination of Christine B.'s parental rights, and the procedures followed did not satisfy procedural due process requirements, and

III. The Juvenile Court abused its discretion on January 31, 2003 when it declined to award formal visitation to Christine B.

We find merit in Christine B.'s third argument. We therefore reverse the Juvenile Court's decision to the extent that it

---

2. When this case began, the District Court of Maryland in Montgomery County sat as the Juvenile Court in that county. Effective March 1, 2002, the legislature transferred jurisdiction over juvenile cases in Montgomery County from the District Court to the Circuit Court for Montgomery County. *See* 2001 Laws of Maryland, Chapter 414. We shall refer simply to the Juvenile Court throughout this opinion, although proceedings that occurred prior to March 1, 2002 took place in the District Court, while proceedings that occurred on or after that date took place in the Circuit Court.

3. This appeal is actually a consolidation of three separate appeals noted by Christine B. The first appeal was taken from the court's decision of September 10, 2002, to grant custody and guardianship of Caya B. to Steven and Michelle S. The second appeal was taken from the court's October 25, 2002 denial of Christine S.'s "Motion to Reconsider," which was filed on October 4, 2002. The third appeal was taken from the court's January 31, 2003 decision, by which it continued custody and guardianship with Steven and Michelle, declined to grant formal visitation to Christine, and closed the case for all purposes except a remand upon appeal. *See* Code (1974, 2002 Repl.Vol.), § 12–303(3)(x) of the Cts. & Jud. Proc. Art. (specifying that an order [d]epriving a parent . . . of the care and custody of his child, or changing the terms of such an order[,]" is an interlocutory order from which an immediate appeal may be filed).

fails to address visitation. We remand the case to that court for further proceedings regarding visitation that are consistent with this opinion.

## FACTS

Caya B. was born in California on September 13, 1999, prior to the marriage of her parents, Christine B. and Craig B. A week after Caya's birth, Christine moved with her to the home of her own parents, Marie and Edward S., in Montgomery County.

The following month, Christine and Caya moved into the home of Christine's brother, Michael S., and his fiancée, Heather T. Craig B. moved from California to Montgomery County and also moved in with Michael and Heather. The arrangement was short-lived, however. The police were called to the home several times because of physical and verbal altercations between Christine and Craig. By Thanksgiving of 1999, Christine and Caya had moved back in with Christine's parents. Craig apparently moved to a nearby campground.

By July of 2000, Marie and Edward S. had become concerned about the care Caya was receiving from Christine. They had observed that Christine left their home for several days at a time, sometimes taking Caya with her and sometimes not. They never knew where Christine went or when she would return. Marie and Edward S. believed that both Christine and Craig abused alcohol. On July 15, 2000, the situation was reported to the Montgomery County Department of Health and Human Services Child Welfare Services Division ("the Department").[4] The Department promptly contacted Marie and Edward S.

The Department then contacted Christine B., who agreed to enter into a "service agreement" to improve the situation. She agreed to participate in urine testing twice a week for

---

4. It is not clear from the record who reported the situation to the Department.

three weeks, to inform her parents at least 24 hours in advance if she intended to leave Caya in their care, and to have no contact with Craig B. until he entered an alcohol treatment program. By July 26, 2000, however, Christine had violated the agreement by leaving home without Caya and without notifying her parents. The Department removed Caya from Christine's care on an emergency basis and placed her with Marie and Edward S.

An emergency shelter hearing was held on July 27, 2000, in the Juvenile Court, and the court returned Caya to her mother's care, but under the supervision of the Department. The court directed that any contact between Caya and Craig B. be supervised by the Department.

Following the hearing, Christine violated the order and her agreement with the Department by leaving Caya with her grandparents without warning, testing positive for marijuana and cocaine use, and taking Caya to visit Craig at the campground where he was staying. Caya was again placed in the temporary custody of her maternal grandparents. On August 8, 2000, another hearing was held in the Juvenile Court and custody of Caya was transferred to Michael S. and Heather T. Visits between Christine and Caya were to be supervised by Michael or Heather.

In September of 2000, Christine moved to Littlestown, Pennsylvania and obtained employment. Craig also moved to Littlestown, although Christine maintained at the time that they were not living together.

Another hearing was held on October 31, 2000, and the Juvenile Court declared Caya to be a Child in Need of Assistance. It directed that Caya temporarily remain in the care and custody of Michael and Heather, and that Christine attend parenting classes, participate in therapy for domestic abuse, attend a drug treatment program, maintain employment, and maintain stable housing separate and apart from Craig B.[5] During this period, the Department's "Permanency

---

5. This hearing was the first hearing regarding Caya that Craig B. attended. In its order, the court directed that Craig attend counseling

Plan" for Caya called for "relative guardianship with her maternal uncle, Michael S., and his fiancée, Heather T."

Following the CINA adjudication, periodic review hearings were held. Caya remained with Michael and Heather until the following spring, when it was determined that she had contracted the Herpes Simplex I—or cold sore—virus. Because Michael and Heather feared that their own daughter would contract the virus, they informed the Department that they could no longer care for Caya. The Department then contacted Christine's other brother, Steven S., and learned that he and his wife, Michelle, would like to care for Caya. Steven and Michelle had two young children.

At that point, the Department developed a permanency plan for Caya that called for "relative placement with guardianship to her maternal aunt and uncle, Steven and Michelle S.," with a "Concurrent Plan" for adoption by Steven and Michelle S. At the next review hearing, on May 22, 2001, the Department recommended that Caya be placed with Steven and Michelle. In a written report, the Department expressed concern that, *inter alia*, Christine had been terminated from various drug treatment and counseling programs due to noncompliance, failed to take parenting classes, failed to participate in therapy for domestic abuse, failed to complete drug treatment, failed to take advantage of the services the Department had offered her, and continued to have extensive contact with Craig B. despite his "domestic violence and substance abuse problems." The Department recommended that Christine's visitation with Caya be limited to once a month under the Department's supervision. It observed: "Craig B. has never requested [to visit] or visited with Caya, since she has been involved with the Department. Craig has never shown any interest in Caya's well[-]being and has not contacted the Department requesting assistance in getting custody."

---

for domestic violence and substance abuse and that he refrain from abusing Christine.

Apparently unwilling to give up on Christine at this point, the Juvenile Court instead, on May 22, 2001, transferred the care and custody of Caya back to her grandparents, Marie and Edward S., with Steven and Michelle having regular visitation in order to facilitate a possible transition to their care. The court also ordered that Christine be permitted to visit with Caya at least twice a week, under the supervision of the Department. The court directed that Christine participate in a drug treatment program, attend Alcoholics Anonymous and Narcotics Anonymous meetings, undergo urinalysis at the direction of the Department, and refrain from using or possessing drugs or alcohol. Finally, it directed that Christine B., Marie and Edward S., and Steven and Michelle S. each undergo an individual psychological evaluation before the next hearing.

According to a report prepared by the Department, in the months following the May 22, 2001 hearing, both Christine B. and Craig B. made substantial progress in addressing their substance abuse and domestic violence problems and in maintaining steady employment and a stable home. In addition, the couple married on February 14, 2002. On March 1, 2002, Christine gave birth to a second child, Noah B.

At the Department's request, the court issued an order dated February 19, 2002, by which it permitted Christine's visitation with Caya to be supervised by Edward S. rather than by the Department. It further permitted Craig B. to visit with Caya under the supervision of the Department.

On June 12, 2002, again at the Department's request, the Juvenile Court issued an order permitting Christine and Craig to have unsupervised visitation with Caya, under the direction of the Department. Caya began staying with her parents for extended periods of time.

On August 16, 2002, however, Christine tested positive for marijuana use. Upon further investigation, the Department learned that Christine could not provide documentation that she had been attending Alcoholics Anonymous meetings and had not obtained a sponsor as was required for another

treatment program in which she was supposed to be participating. She had lost her job in early July. Although she claimed then to be working with Craig as a subcontractor for a fencing company, she had failed to report the matter to the Department. The Department also learned that Christine had attended only 13 of 26 therapy sessions that had been scheduled over the past few months, and that she had not attended any therapy sessions since the end of July. Craig, who was on probation and was required to comply with weekly urinalysis, had not reported for testing since the previous March.

In a written report prepared for the next review hearing, the Department outlined the perceived deficiencies on the parts of Christine and Craig and expressed its intention to pursue its permanency plan of placing Caya with Steven and Michelle S. Both Christine and Craig appeared for the hearing on September 10, 2002. This time, the court agreed with the Department. It stated:

We have been at this a long time. I think we have given the mother ample opportunity to prove that she can be as consistent as is required for us to believe that we could return the child to her.

... I think that ... the Department presents a plan that is most likely to be in the best interest of this child, that although the grandmother has provided consistent and long-term custody and care for this child that to place the child with the uncle and aunt at this time is appropriate.

The court thus granted custody and guardianship to Steven and Michelle S. Because Caya had been living with Marie and Edward S., the court directed that the transition be gradual, with Steven and Michelle visiting Caya for a period of time before Caya moved into their home. The court ordered that Christine and Craig could visit Caya once a month at the home of Steven and Michelle, and that Christine and Craig "remain drug and alcohol free for visits." The court indicated that it would review the case in 120 days.

The review hearing was held on January 31, 2003. Again, both Christine and Craig were present for the hearing, al-

though Craig was not represented by counsel. At the close of the hearing, the court determined that it was in Caya's best interest that custody and guardianship remain with Steven and Michelle S.[6] It closed the case "except for the purpose of complying with any mandate of an appellate court. . . ." In response to a question by Christine's counsel as to how visitation would be effectuated, the court responded, "I think guardianship doesn't include visitation, unless someone can persuade me otherwise." Counsel for the Department agreed with the court and added that, in any event, "Steven . . . is not going to preclude her from visiting Caya. . . ." The court then stated that visitation could "be done in some unofficial way. . . ."[7]

## STANDARD OF REVIEW

Recently, in *In Re: Yve S,* 373 Md. 551, 586, 819 A.2d 1030 (2003), the Court of Appeals discussed the standard of review in cases involving a Child in Need of Assistance. The Court reiterated that there are

---

**6.** While the court was issuing its ruling, counsel for Christine interrupted to proffer to the court that Steven and Michelle S. planned to move to Florida the next day. Counsel for the Department proffered in response that the family did not plan to move until the following summer, and that Christine had indicated that she would be moving to Florida as well. The court stated that "none of this [is] evidence before the court." It did not mention the matter in issuing its ruling.

Appellate counsel for Caya B. asserts in the brief filed on behalf of the child that Steven and Michelle S., along with Caya and their children, "moved to St. Petersburg, Florida in late June of 2003." Nothing in the record confirms this. Nor is there any indication in the record as to whether Christine B. moved to Florida or remains in Pennsylvania. Even assuming that the parties have moved, however, we are satisfied that the trial court retains jurisdiction to decide this case upon remand. *See* Code (1974, 2002 Repl.Vol., 2003 Cum.Supp.), § 3–804(a) and (b) of the Cts. & Jud. Proc. Art. (regarding jurisdiction of juvenile courts in CINA cases); Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.), §§ 9–201(d)(2) and 9–204(a)(1) and (2) of the Fam. Law art. (regarding Maryland Uniform Child Custody Jurisdiction Act).

**7.** *See In Re: Emileigh F.,* 355 Md. 198, 204, 733 A.2d 1103 (1999) (holding that a juvenile court may not close a CINA case while an appeal is pending because such action "would in essence defeat the right of [the appellant] to prosecute her appeal with effect").

"three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c) ] applies. [Secondly,] if it appears that the [juvenile court] erred as to matters of law, further proceedings in the [juvenile] court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [juvenile court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [juvenile court's] decision should be disturbed only if there has been a clear abuse of discretion."

*Id.* at 586, 819 A.2d 1030 (quoting *Davis v. Davis*, 280 Md. 119, 125–26, 372 A.2d 231 (1977)).

In *In Re: Adoption/Guardianship No. 3598*, 347 Md. 295, 312–13, 701 A.2d 110 (1997), the Court stated:

Judicial discretion [has been defined] as "that power of decision exercised to the necessary end of awarding justice and based upon reason and law, but for which decision there is no special governing· statute or rule." It has also been defined as a "reasonable decision based upon the weighing of various alternatives." . . . There is an abuse of discretion "where no reasonable person would take the view adopted by the [trial] court," . . . or when the court acts "without reference to any guiding rules or principles." . . . An abuse of discretion may also be found where the ruling under consideration is "clearly against the logic and effect of facts and inferences before the court," . . . or when the ruling is "violative of fact and logic." . . . .

Questions within the discretion of the trial court are "much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." . . . In sum; to be reversed "the decision under consideration has to be well removed from any center mark imagined by

the reviewing court and beyond the fringe of what that court deems minimally acceptable." . . .

(Citations omitted.)

## DISCUSSION

## I

### Custody and Guardianship

Christine B.'s first argument concerns the Juvenile Court's decision of September 10, 2002, granting custody and guardianship of Caya to Steven and Michelle S., subject to further review by the court. Christine suggests that the court's decision was based entirely on the single urinalysis that tested positive for marijuana, and asserts that the court was "unreasonable in completely dismissing [the] possibility" that it was a "false positive." She argues that, in any event, it was more significant that, "[f]or over a year, there was no evidence that either parent was using alcohol or drugs," and that "[b]oth parents had complied with all that the Department had requested." Christine contends that, given the success of the extended visits she had been having with Caya and the evidence that Caya's brother Noah was receiving adequate care, the court should have returned custody and guardianship of Caya to her.

Christine B.'s argument is fundamentally flawed in that the court's decision was not based on the single urinalysis. Rather, as we explained in our recitation of the facts, once the Department learned that Christine had tested positive on August 16, 2002 for marijuana use, it launched an investigation. The investigation revealed that Christine had no proof that she had been attending Alcoholics Anonymous meetings, had not obtained a sponsor as was required for another treatment program in which she was supposed to be participating, had lost her job in early July and had failed to report it to the Department, had missed 13 of 26 therapy sessions that had been scheduled over the past few months, and had not attended any therapy sessions since the end of July.

76

"Certainly, the right of the parent to rear the child is 'an important, natural, and legal right.' " *In Re: Adoption/ Guardianship No. 3598*, 347 Md. at 324, 701 A.2d 110 (citation omitted). "Indeed, in Maryland, we have .recognized that there exists 'a prima facie presumption that the child's welfare will be best subserved in the care and custody of its parents.' " *Id.* at 324–25, 701 A.2d 110 (citation omitted). This presumption "may be rebutted by evidence of unfitness or exceptional circumstances, and, when weighed against the best interest of the child, parental rights may be trumped." *Id.* at 325, 701 A.2d 110. It is beyond dispute that " 'in any child custody case, the paramount concern is the best interest of the child.' " *Sider v. Sider*, 334 Md. 512, 533, 639 A.2d 1076 (1994) (citation omitted).

The presumption that it was in Caya's best interest to remain with Christine B. was rebutted in October of 2000, when the court declared Caya to be a Child in Need of Assistance and Caya was removed from Christine's care.

Where the child has been declared a "child in need of assistance" because of abuse or neglect, the [juvenile] court is . . . constrained by the requirements of § 9–101[ (b) of the Family Law Article] . . . to deny custody to the parent unless the court makes a specific finding that there is no likelihood of further abuse or neglect. . . . *The burden is on the parent previously having been found to have abused or neglected the child to adduce evidence and persuade the court to make the requisite finding under § 9–101(b).*

*In Re: Yve S.*, 373 Md. at 587, 819 A.2d 1030 (emphasis added) (citations omitted).

At the close of the hearing on September 10, 2002, the Juvenile Court concluded, in effect, that Christine B. had failed to shoulder her burden. Indeed, contrary to Christine's assertions, she offered no reason at the hearing for the court to believe that the urinalysis result was erroneous. The court did not accept. Christine's explanations as to why she had not attended all of her counseling sessions, why she had been unable to establish to the Department's satisfaction that she

was attending Alcoholics Anonymous meetings and properly pursuing drug treatment, and why she failed to inform the Department that she had lost her job. "Judging the weight of evidence and the credibility of witnesses and resolving conflicts in the evidence are matters entrusted to the sound discretion of the trier of fact." *In Re: Timothy F.*, 343 Md. 371, 379, 681 A.2d 501 (1996). We perceive no error.

■ Christine further argues that the court should have considered granting custody and guardianship to Craig B., who had not tested positive for marijuana use. Assuming, *arguendo*, that Christine has standing to make this argument on behalf of her husband, who is not a party to this appeal, we are unpersuaded. The court was never asked to place Caya with Craig B. At the time of the hearing in question, Craig B. resided with Christine and the couple's other child, Noah. The court was well aware, moreover, that the hearing was the first that Craig B. had attended since October 31, 2000, when Caya was declared to be a Child in Need of Assistance. There is no indication from the record extract supplied to this Court that Craig B. had a service agreement with the Department, or that Craig B. had ever expressed interest in having custody of Caya. Rather, the record indicates that for a lengthy period of time Craig B.'s alleged abuse of Christine served as one of many impediments to Christine regaining custody.

## II

### Termination of Parental Rights

Christine B. further argues that the Juvenile Court's actions on January 31, 2003 amounted to a termination of her parental rights. She contends that by granting custody and guardianship of Caya B. to Steven and Michelle S., refusing to order formal visitation, and closing the case for all but appellate purposes, the court, in effect, denied her "any means to maintain any contact whatsoever with her child." Christine posits that the court failed to make the express findings necessary for a termination of parental rights.

■ A permanency plan in a CINA case may call for, *inter alia,* custody and guardianship with a relative *or* adoption by a relative. *See* Code (1974, 2002 Repl.Vol., 2003 Repl.Vol.), § 3–823(e)(1)(ii) of the Cts. & Jud. Proc. Art. If the permanency plan calls for custody and guardianship by a relative but does not contemplate adoption, the court may issue a decree of guardianship to the relative and may then close the case. *See id.,* § 3–823(h)(iii)(1). Parental rights are not terminated in such a situation: the parents are free at any time to petition an appropriate court of equity for a change in custody, guardianship, or visitation. *See generally* Code (1974, 2002 Repl. Vol., 2003 Cum.Supp.), § 1–201 of the Cts. & Jud. Proc. Art.

■ If the permanency plan calls for adoption by a relative, the court may grant guardianship of the child to the local department with the right to consent to adoption. *See* Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.), §§ 5–301(b) and (c), 5–313(a)(2), and § 5–317 of the Fam. Law Art. Before doing so, however, the court must make express findings, based on clear and convincing evidence, as to the required considerations set forth in § 5–313(c) of the Family Law Article. *See In Re: Adoption/ Guardianship No. 95195062/ CAD,* 116 Md.App. 443, 457–59, 696 A.2d 1102 (1997). *See also Shurupoff v. Vockroth,* 372 Md. 639, 652–54, 814 A.2d 543 (2003); *In Re: Adoption/Guardianship No. 95195062/CAD,* 116 Md.App. at 454, 696 A.2d 1102. The court will not close the case until the adoption takes place. *See generally* Code (1984, 1999 Repl.Vol.), § 5–319 of the Fam. Law Art. In such a situation, parental rights *are* terminated when the decree of guardianship is entered. *See id.,* § 5–317(f)(1).

■ The Juvenile Court's actions did not terminate Christine's parental rights. Although the Department's permanency plan for Caya prior to the January 31, 2003 hearing called for Steven and Michelle to retain custody and guardianship with a concurrent plan for adoption, counsel for the Department did not inform the court at the hearing that the ultimate goal was adoption. Adoption was not mentioned at the hearing by counsel or any witness, and Christine B. directs this

Court to nothing in the record that would indicate that, at the time of the hearing, adoption was still a consideration. The court did not mention adoption when it issued its ruling. It did not purport to grant guardianship to the Department with the right to consent to adoption. It granted custody and guardianship—and nothing more—to Steven and Michelle S. The fact that the court closed the case for all but appellate purposes punctuates the fact that the guardianship granted was not the type granted in contemplation of adoption and thus did not terminate Christine's parental rights.

## III

### Visitation

At the close of the January 31, 2003 hearing, after the Juvenile Court had granted custody and guardianship to Steven and Michelle S. and closed the case for all but appellate purposes, counsel for Christine B. asked the court how Christine "will effect visitation in this case." The discussion proceeded as follows:

THE COURT: Well, if you have a guardianship, I don't know how you do visitation.

MS. LONG [Counsel for Christine B.]: So effectively, we have terminated her parental rights without a parental rights trial, Your Honor.

THE COURT: I am not terminating her parental rights. I am placing the child in guardianship with a relative. That is what this provides.

MS. LONG: ... Your Honor is refusing to order visitation and refusing to have hearings which leaves her in a very difficult position[. A]lthough, you are technically saying that you are keeping the case open, the case really isn't open because she has no avenue at all and no voice....

THE COURT: I think that the statute, as I read it, provides for guardianship with a relative. I haven't heard the Department yet about visitation. *I think guardianship doesn't include visitation unless someone can persuade me to the contrary.*

(Emphasis added.) Counsel for the Department agreed that formal visitation could not be ordered, and asserted that "Steven ... is not going to preclude [Christine B.] from visiting Caya...." The court then concluded that visitation "can be done in some unofficial way."

Christine B. contends that the court's belief that it had no authority to order visitation in this case was erroneous. She argues that the court had discretion to order visitation, and that its failure to exercise that discretion amounted to an abuse.

Both the Department and Caya B. agree that the court had discretion to order visitation. The Department contends that Christine B. waived the argument for appellate purposes by failing to attempt to convince the Juvenile Court that it was wrong. It further contends that any error was harmless, in that, in the Department's view, Christine "has not been and will not be denied visitation." Caya B. maintains that the Juvenile Court *did* exercise its discretion. She suggests that the record shows that the court realized it could order visitation but chose not to do so because it believed the matter would be better handled informally.

 Preliminarily, we reject the arguments made by the Department and Caya B. Contrary to Caya B.'s assertions, the quoted portions of the transcript clearly show that the court did not believe it could order visitation once it had granted custody and guardianship to Steven and Michelle S. and had closed the case. The court did not decide that the matter *should* be handled unofficially rather than officially, but merely expressed its belief that the matter *would* be handled unofficially.

Contrary to the Department's assertions, counsel for Christine made clear that she disagreed with the court when she argued that, by refusing to order visitation and closing the case, the court was denying Christine access to her daughter and was foreclosing avenues of redress. Counsel was not required to use any particular words in stating her objection and was not required to continue to object once it became

apparent that her actions would be futile. *See, e.g., Johnson v. State,* 325 Md. 511, 515, 601 A.2d 1093 (1992). The fact that Steven S. had stated that he would permit Christine to visit Caya could not render any error harmless. There is simply no way to know what might transpire between Christine and her brother in the future.

As we indicated in Part II of our discussion, the Juvenile Court granted custody and guardianship of Caya to Steven and Michelle pursuant to § 3–823(e)(1)(ii)(2) of the Courts and Judicial Proceedings Article. The court did not act pursuant to § 5–313 of the Family Law Article. Although the court was authorized to close the case absent a finding of good cause not to do so, *see* § 3–823(h)(1)(iii), the closure did not affect Christine's parental rights. The court had discretion either to order formal visitation or to deny visitation as no longer appropriate. It did not have discretion to leave the matter in the hands of Steven and Michelle.

 As the Court of Appeals has explained:

... [A] trial court may not delegate judicial authority to determine the visitation rights of parents to a non-judicial agency or person. . . . While determinations concerning visitation are generally within the sound discretion of the trial court, . . . not to be disturbed unless there has been a clear abuse of discretion, . . . where a trial court's order constitutes an improper delegation of judicial authority to a non-judicial agency or person, the trial court has committed an error of law, to be reviewed by appellate courts *de novo*. . . .

*In Re: Mark M.,* 365 Md. 687, 704–05, 782 A.2d 332 (2001) (in open case, juvenile court erred in delegating, to therapist employed by local department of human services, decision as to whether visitation should occur between mother and child found to be in need of assistance). The court must "determine, and set forth in its order, at least the minimal amount of visitation that is appropriate . . ., as well as any basic conditions that it believes, as a minimum, should be imposed." *In Re: Justin D.,* 357 Md. 431, 449–50, 745 A.2d 408 (2000) (in open case, juvenile court erred by delegating decisions regard-

ing whether, and how much, visitation should occur between mother and child to local department of human services).

We therefore reverse the Juvenile Court's decision to the extent that it fails to address visitation. We remand the case to the Juvenile Court to determine whether visitation should be granted to Christine B. If the court determines that visitation is appropriate, the court must further determine the amount of visitation and any basic conditions that should apply.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS THE JUVENILE COURT, REVERSED TO THE EXTENT THAT IT FAILS TO ADDRESS VISITATION. JUDGMENT OTHERWISE AFFIRMED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ⅔ BY APPELLANT AND ⅓ BY APPELLEE.**