Circuit Court for Baltimore City
Case No. T16130002

REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

No. 2110

September Term, 2016

_____

IN RE: ADOPTION/GUARDIANSHIP OF
T.A., JR.

_____

Eyler, Deborah S.,
Nazarian,
Friedman,

JJ.

_____

Opinion by Friedman, J.

_____

Filed:  August 30, 2017

This appeal stems from the erroneous admission of hearsay evidence (Exhibit 91) during proceedings that terminated the rights of T.A.'s biological parents. Mother did not appeal. Father has brought this appeal arguing that the erroneous admission of Exhibit 91 (a group of five reports) requires reversal of the judgment, and that he should, therefore, have another opportunity to defend against the termination of his parental rights. Because we conclude that the admission of Exhibit 91 was harmless error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

T.A. was born January 4, 2012, premature and drug-exposed. He tested positive for opiates at birth and suffered from withdrawal symptoms that required the intravenous administration of morphine. T.A.'s mother also tested positive for opiates at the time of his birth. Mother had a history of abusing illicit drugs and had past and continuing interactions with Child Protective Services for her other two children (the full history and outcome of which is not included in the record for this case). At the time of T.A.'s birth, neither his Mother nor his Father had any supplies prepared such as infant formula, a car seat, or diapers. Neither Mother nor Father had employment or housing.

Upon his release from the hospital, T.A. was immediately placed in the care of Mr. and Ms. B. Shortly thereafter, T.A. was found to be CINA (Child in Need of Assistance) and was committed to the Baltimore City Department of Social Services (DSS). The permanency plan for T.A. was initially set as reunification with his birth parents, primarily

his Mother. Father and Mother were both referred to the Family Recovery Program (FRP)[1], as well as drug treatment and parenting classes.

Due to his premature birth, T.A. has chronic lung disease and takes several medications to manage his condition. A consequence of T.A.'s condition is that occasional short-term exposure to second-hand cigarette smoke could trigger serious medical events, while long-term exposure to second-hand cigarette smoke could be detrimental to T.A.'s already diminished lung function. Moreover, any exposure to cigarette smoke could lower T.A.'s immune responses to viruses, placing him at higher risk of developing serious respiratory infections, such as pneumonia. By January of 2013, he had been hospitalized several times and required daily medications and monitoring.

At the time of the CINA Contested Review hearing in January of 2013, Father was incarcerated and awaiting trial. Prior to his incarceration, Father had last visited T.A. in July of 2012. He had also failed to complete a drug treatment program. Although Mother had not visited T.A. since August of 2012, at the January 2013 review hearing, she "re-engaged" with the department, asking to be re-referred to a drug treatment program and

---

[1] FRP and the Baltimore City DSS have partnered together to run a drug court program to serve "adult parents whose children have been removed from their care for reasons related to substance abuse." *Family Drug Court, Peer Learning Court, Baltimore City Family Recovery Program*, Children and Family Futures, available at https://perma.cc/2GNN-WPQ4 (link captured June 28, 2017). "FRP coordinates services with [DSS] … to develop a Recovery Services Plan that is coordinated with the [DSS] Service Plan. This coordinates the parents' efforts and increases the likelihood of reunification." *Id.*

offered her mother, T.A.'s maternal grandmother, as a possible placement. Following that review hearing, the juvenile court continued T.A.'s commitment and changed the permanency plan to "placement with a relative for custody and guardianship."

Following the next CINA Contested Review hearing on October 28, 2014, the permanency plan was again modified to "reunification with parent concurrent with custody and guardianship or adoption by a non-relative." At that hearing it was reiterated that T.A.'s respiratory disease was made worse by viral infections and environmental irritants such as dust, mold, and smoke exposure. At the time of the October 2014 hearing, Mother was incarcerated awaiting trial, but Father had been released from incarceration. Although Father had re-initiated visitation with T.A. and indicated that he was "interested in working towards reunification," Father did not have housing or employment. At the hearing, Father volunteered to be referred to FRP and was instructed to complete a psychological evaluation, and attend parenting classes and substance abuse treatment. Also at that hearing, T.A.'s paternal grandmother and great-grandmother, who had been suggested by Father as possible placement options, were ruled out as possible care givers for T.A. because they had not visited T.A. or attended medical appointments.

In 2015, Father was re-arrested but released after three weeks' incarceration. Father was participating in FRP, but was in poor compliance and had not submitted satisfactory urinalysis. Father was also in the Powell Recovery Program and had signed a service agreement, but still did not have employment or housing.

3

At the April 2015 "26-Month Review" hearing, the juvenile court noted that T.A. was still in the care of Mr. and Ms. B., with whom he had resided since birth, and that he was "being well taken care of in their care." T.A. continued to take medications for his chronic lung disease and asthma and received treatment from a pediatrician, pulmonologist, and nephrologist. At the time of the April 2015 hearing, Mother remained incarcerated. By September of 2015, however, Mother was no longer incarcerated and both Father and Mother had completed the "Circle of Security Parenting" course.

When T.A. was four years old, T.A., Father, Mother, and the B.s attended another CINA Contested Review hearing. At the hearing, on March 16, 2016, Ms. B. testified about T.A. She testified that T.A. is an outgoing four-year old. T.A. attends pre-school, helps Ms. B. cook, attends Boy Scouts, participates in a baseball league, and swims. The B.s consider T.A. part of their family and he is very attached to their son. Although T.A. is healthy now, he does require proactive supervision and constant review of his medications. Ms. B. also testified that although T.A. will talk about his visits to DSS and refer to Ms. Hemingway (his case worker) and what he does on the visits, he does not talk about Father or Mother. The hearing was adjourned after Ms. B.'s testimony.

The contested review hearing resumed two days later. Ms. Hemingway, T.A.'s case worker since days after his birth, testified that T.A. is "well bonded to the [B.s] (calling them 'mommy' and 'daddy') and their son." Ms. Hemingway described the speech, physical, and behavioral therapies that T.A. has received and stated that his chronic pulmonary disease is improved and managed. Ms. Hemingway testified that, as of April

4

24, 2014, Father and Mother had kept all of their weekly visits with T.A. and that T.A. interacts well with them. Ms. Hemingway also described the service agreements signed by Father and Mother. Pursuant to his servicing agreement, Father completed parenting classes, attended T.A.'s medical appointments, and enrolled in a smoking cessation program. Father, however, did not complete the smoking cessation program, and did not obtain employment. Additionally, although Father was enrolled in Powell Recovery, there was no certificate of completion, nor was he compliant with FRP. Following Ms. Hemingway's testimony, the juvenile court held the matter *sub curia*.

At the next hearing, a month later, Mother testified. Mother admitted that her drugs of choice are heroin and Percocet and the court found that she was in full relapse. Although Mother testified that she had stopped smoking in the past two weeks, the juvenile court found that statement not credible given the failure to stop smoking over the past four years and the admitted CDS relapse. After closing arguments, the juvenile court found that Father and Mother have completed a parenting program and have visited with T.A. either every week or every other week, but neither has ceased smoking or achieved sustained sobriety. The juvenile court concluded that "Mother and Father's progress toward reunification is very fundamentally inadequate on these core issues of [addiction,] relapse[,] and smoking. There is no likelihood that Mother or Father would overcome the significant barriers to reunification in the foreseeable future." The juvenile court recognized Father's unwillingness to offer himself as a resource for T.A., and Mother's long history of relapses and excuses. The juvenile court concluded that DSS had made reasonable efforts to achieve

5

the concurrent permanency plan of reunification or adoption by a non-relative, but that it was in the best interests of T.A. to change the permanency plan to "adoption by a non-relative." As a result, the juvenile court also terminated the parental rights of Father and Mother.

Father's casefile from FRP confirms much of the information contained in the court orders but also explains additional background information about Father. [2] Father completed the intake process with FRP on October 31, 2014. Father and his caseworker discussed his drug and alcohol use, medical history, employment history, relationship status, and legal status. During the intake, Father admitted using alcohol, drugs, and tobacco in the last 30 days. He reported some hospitalizations for medical problems, but denied that he had any current medical problems. Father admitted that he experiences depression, sadness, and hopelessness, but denied contemplating suicide and appeared motivated to change his substance abuse patterns. Father also reported that he had not worked in the past six months and that his longest full-time job was for one year and six months.

The detailed staff notes contained in Father's FRP casefile reveal that Father continued to use heroin in 2014 and 2015. In the beginning of 2015, Father reported

---

[2] There is a similar casefile in evidence for Mother that describes her struggles to remain compliant with FRP and to stop smoking and taking drugs. Because Mother has not challenged the court's findings, however, we will not detail the information contained in her file.

considering suicide and was referred to Hope Health. Shortly thereafter, Father was incarcerated for a time, before again, in March of 2015, reporting being suicidal. Father was then referred to Powell Recovery for detox and inpatient treatment. In May of 2015, Powell Recovery contacted FRP to report that Father was hearing voices telling him to commit suicide. Father was hospitalized for a brief period. In the months following, Father's urinalysis tested positive for cocaine. In August of 2015, Father reported to FRP that his attorney had advised him to turn himself in on an open arrest warrant, but that he was not ready to do so yet. FRP warned Father that if Powell Recovery discovered that he had an open warrant he could be discharged from residential treatment. Father was arrested on that open warrant while at FRP, but then reported that he had been released by mistake and did not plan to return to the FRP court hearings. The FRP records indicate that Father was in either poor compliance or no compliance with the program, with brief periods of good compliance.

The juvenile court gave a clear summary of this case:

> Frankly, the same issues that encountered the parents when Respondent was born in January of 2012 are the same issues that remain today in November [of] 2016. … The parents have demonstrated no real desire to raise their son.

**DISCUSSION**

Exhibit 91 is a set of five reports:[3]

     (1) a bonding evaluation of the B.s and T.A.;

     (2) a parental fitness evaluation of Mother;

     (3) a parental fitness evaluation of Father;

     (4) a fitness evaluation of the B.s; and

     (5) a bonding evaluation of Father and Mother with T.A.

The parental fitness evaluations of Father and Mother (#2 and #3), and all of the bonding evaluations (#1 and #5) were authored by Dr. Ruth Zajdel, consulting psychologist for Medical Services-Juvenile Court. The bonding evaluations were based on Dr. Zajdel's observation of each adult interacting with T.A. in a play room for 30 minutes. Dr. Zajdel observed their interactions through a one-way mirror. Dr. Zajdel authored the parental fitness evaluations of both Father and Mother (#2 and #3) after she interviewed them individually. Brenda Harriel, a social worker for Medical Services, wrote the fitness evaluation of the B.s (#4). Ms. Harriel based her recommendations on interviews with Ms. B. and Mr. B., her review of court orders, and a letter written by Dr. Jay Gopal (head of pediatrics at Union Memorial Hospital and a member of T.A.'s medical team). Neither Ms. Harriel nor Dr. Zajdel testified at the hearings.

---

[3] It has been our experience that it is easier to give a separate discrete exhibit number to each document. The decision not to do so here, to label five separate reports collectively as Exhibit 91, makes our discussion grammatically stilted.

Exhibit 91 was admitted during DSS's case. DSS sought to admit Exhibit 91 into evidence without a witness on the stand. Father objected to the admission stating that it was "hearsay within hearsay and there is no reason why the authors of those reports cannot be here to testify. ... I can't cross examine a document." DSS argued in response that Exhibit 91 was a certified business record and that there had been a 10-day notice to each party that DSS intended to introduce Exhibit 91. Thus, DSS concluded that Father should have filed an objection or motion in response to the 10-day notice if he wished to exclude Exhibit 91 from evidence. The juvenile court, without further explanation, admitted Exhibit 91.

On appeal, Father argues that the juvenile court erred by admitting Exhibit 91 because it was inadmissible hearsay. Both DSS and T.A. (through his assigned attorney) concede that Exhibit 91 is inadmissible hearsay. They argue, however, that the admission of Exhibit 91 was harmless error because Exhibit 91 is merely cumulative of all of the other exhibits and testimony offered in the case.

Despite this confession of error, we will begin our analysis by explaining that it was error for the juvenile court to admit Exhibit 91. We will then turn to the question of whether the admission of Exhibit 91 was harmless error. Because we conclude that the admission of Exhibit 91 did not create a substantial likelihood of prejudice to Father, we conclude that the admission of Exhibit 91 was harmless error.

### 1.    Hearsay and the Business Records Exception

All of the parties now concede that Exhibit 91 is hearsay because each of the reports within Exhibit 91 were out of court statements made by Dr. Zajdel and Ms. Harriel, offered for the truth of the matters asserted in the reports. At the juvenile court, however, DSS argued that the reports fell under the business records exception to the hearsay rule and was, therefore, admissible. Father argued at the juvenile court, and continues to argue now, that Exhibit 91 did not fall under the business records exception for several reasons: *first*, the reports were prepared specifically for the CINA hearings and have nothing to do with the day to day operations of the Court Medical Services; *second*, the reports are the opinions of Dr. Zajdel and Ms. Harriel based on their interactions with, and observations of, the parties; and *finally*, as a matter of fundamental fairness, the juvenile court should have allowed Father to cross-examine Dr. Zajdel and Ms. Harriel about the reports.

Hearsay is not admissible unless it falls into an exception. Md. Rule 5-802. One such hearsay exception is for "Records of Regularly Conducted Business Activity." Md. Rule 5-803(b)(6). This exception allows for the admission of a report (memoranda, record, or data), despite the report being hearsay, if it was created in the regular course of business by a person with knowledge of the event at or near the time of the event. Md. Rule 5-803(b)(6). Also, it must be the regular practice of the business "to make and keep the memorandum, report, record, or data compilation." Md. Rule 5-803(b)(6). The business record exception "is based on the premise that because the records are reliable enough for the running of a business … they are reliable enough to be admissible at trial." *Hall v. Univ.*

10

*of Maryland Med. Sys. Corp.*, 398 Md. 67, 89 (2007). The exception does not, however, "embrace statements by persons outside the business, because those persons are under no business duty to record or transmit information truthfully." *Id.* (quoting Lynn McLain, *Maryland Rules of Evidence,* Rule 5-803(b)(6), § 4(q)(i), 237 (2d ed. 2002)). The exception also does not "embrace self-serving records, made in anticipation of litigation." *Sail Zambezi, Ltd. v. Maryland State Highway Admin.*, 217 Md. App. 138, 156 (2014) (citing *Hall*, 398 Md. at 89).

Reports created by Court Medical Services for review in child access cases do not qualify for the business records exception. *In re Adoption/Guardianship No. 95195062/CAD in Circuit Court for Baltimore City*, 116 Md. App. 443, 464 (1997). In that case, a Court Medical Services report was ordered for a CINA case. *Id.* at 462. The Court Medical Services doctor evaluated the mother and issued a report that was entered into evidence without testimony from a custodian of records or from the doctor who wrote the report. *Id.* at 462-64. This Court held that the juvenile court erred by admitting the record and that the report did not qualify for the business records exception. *Id.* Judge Ellen L. Hollander, for this Court, held that:

> the report was prepared when [the parent] was evaluated in anticipation of a CINA hearing. It had nothing to do with the "running" of the Juvenile Court Medical Service of the Circuit Court for Baltimore City. Although hospital records often are admitted under this exception, *the kind of information at issue here is qualitatively different*. This report constitutes the *opinion* of an expert who was directed to evaluate [the parent] and opine about her mental health. Plainly, *as a matter of*

11

> *fundamental fairness*, [the parent] was entitled to cross-examine the doctor in order to challenge his opinion.

*Id.* at 464 (emphasis added). The case was remanded for further proceedings and the juvenile court was instructed not to consider the Court Medical Services report on remand unless the doctor who authored the report was called to testify. *Id.* at 461, 466.

It is clear from *In re Adoption/Guardianship No. 95195062/CAD*, that Father is correct in each of his arguments. *First*, the reports contained in Exhibit 91 "had nothing to do with the 'running' of the Juvenile Court Medical Service." *Id. Second*, the reports contained in Exhibit 91 were the opinions of Dr. Zajdel and Ms. Harriel and, therefore are "qualitatively different" from the information typically contained in a business record. *Id.* And *finally*, "as a matter of fundamental fairness," *id.*, Father should have been allowed to cross-examine Dr. Zajdel and Ms. Harriel about the reports contained in Exhibit 91. As a result, the reports contained in Exhibit 91 do not qualify for the business records exception.[4]

---

[4] We determine here that Exhibit 91 is hearsay, was not admissible under the business records exception, and, therefore, required a sponsoring witness with knowledge of the subject matter rather than just a custodian of records. No argument was offered below or in this Court, and therefore we have not considered whether Exhibit 91 might have been admissible under "relaxed" rules of evidence permitted by Rule 5-101(c)(6) or (7). *See* Md. Rule 5-101(c)(6) ("[T]he court, in the interest of justice, may decline to require strict application of the rules in … [d]isposition hearings … including permanency planning hearings."); Rule 5-101(c)(7) ("[T]he court, in the interest of justice, may decline to require strict application of the rules in [child custody or visitation] [m]odification hearings."). Neither were we asked to consider and therefore make no intimation whether, despite our observations about Exhibit 91 as a whole, a severable portion of it might, nevertheless satisfy requirements of the business document exception and might be admissible with only a custodian of records as a sponsoring witness.

Moreover, although the parties have conceded here that Exhibit 91 is hearsay, and although *In re Adoption/Guardianship No. 95195062/CAD* expressly held twenty years ago that such reports are inadmissible hearsay, we now repeat that Exhibit 91, and reports like them, do not meet the requirement of the business records exception.[5]

DSS tried to salvage the situation by arguing in the juvenile court that, because it sent a 10-day notice of its intent to introduce Exhibit 91 pursuant to Rule 5-902, Exhibit 91 was authenticated and admissible. This argument does not withstand scrutiny. Rule 5-902(b)(1) states that:

> Testimony of authenticity as a condition precedent to admissibility is not required as to the original or duplicate of a record of regularly conducted business activity, within the scope of Rule 5-803(b)(6) that has been certified pursuant to … this Rule, provided that at least ten days prior to the commencement of the proceeding in which the record will be offered into evidence, (A) the proponent (i) notifies the adverse party of the proponent's intention to authenticate the record under this subsection and (ii) makes a copy of the certificate and record available to the adverse party and (B) the adverse party has not filed within five days after service of the proponent's notice written objection on the ground that the sources of information or the method or circumstances of preparation indicate lack of trustworthiness.

---

[5] At oral argument, we were advised that it has become standard practice for DSS to introduce reports of this kind without offering a sponsoring witness. Although we understand budget and personnel limitations, we cannot permit a failure to abide by the Rules of Evidence, particularly (but by no means exclusively) when fundamental constitutional rights are at stake.

Md. Rule 5-902(b)(1). The 10-day notice allowed by Rule 5-902 only authenticates a document, however, and does not render that document automatically admissible. Md. Rule 5-902(b)(1). The rule states that by following its procedure, "[t]estimony of *authenticity* as a condition precedent to admissibility is not required." Md. Rule 5-902(b)(1) (emphasis added). The rule does not state that the document becomes automatically admissible. DSS's argument, therefore, that Exhibit 91 was automatically admissible because DSS provided 10-day notice, must fail.

### 2.    Harmless Error

While Exhibit 91 should not have been admitted, and the juvenile judge erred by overruling Father's objection, this error does not necessarily require reversal. It is this court's policy "not to reverse for harmless error." *In re: Yve S.*, 373 Md. 551, 616 (2003). Therefore, we must determine whether the error in admitting Exhibit 91 was harmless. *Id.* at 616-17. In *In re: Yve S.*, the Court of Appeals concluded that although there is no precise standard, a reversible error must be one that affects the outcome of the case, the error must be "substantially injurious," and "[i]t is not the possibility, but the probability, of prejudice" that is the focus. *Id.* at 618 (internal citations omitted). The *Yve S.* Court reasoned that appellate review of harmless error must be on a case-by-case basis and must balance "the probability of prejudice in relation to the circumstances of the particular case." *Id.*

Here, Father's allegation of prejudice is that the juvenile court "relied on the information in the reports to reach several critical conclusions about the bond T.A. had with his [biological] parents, the [biological] parents' fitness to parent, T.A.'s adjustment

14

to the care of, and bond with, the foster care providers, and the potential harm to T.A. if his placement were to change." Father reasons that the juvenile court's conclusions about those bonds and about Father and Mother's fitness to parent "formed a substantial basis for its ultimate conclusion to terminate parental rights." DSS responds that Exhibit 91 was not critical to the juvenile court's ultimate decision because the information contained in Exhibit 91 was merely duplicative of the ample evidence presented at the hearings regarding Father and Mother's bonds with T.A. and their unfitness to parent.

We will, *first*, individually review the juvenile court's analysis of each factor. For each factor we will determine if the court explicitly or implicitly referenced Exhibit 91. If it did, we will then review the evidence available that pertains to that factor to conclude if there is a probability that Exhibit 91 prejudiced the juvenile court's analysis of that factor. *Second*, after reviewing the factors individually, we will then review them collectively.

### a. Termination of Parental Rights Factors

The legislature has directed that "a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests." Md. Code Ann., Family Law (FL) § 5-323(d). The legislature has provided a non-exclusive list of factors to guide this consideration including:

> (1)(i) all services offered to the parent before the child's placement, whether offered by a local department, another agency, or a professional;

(ii) the extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent; and

(iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;

(2) the results of the parent's efforts to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home, including:

(i) the extent to which the parent has maintained regular contact with:

1. the child;

2. the local department to which the child is committed; and

3. if feasible, the child's caregiver;

(ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

(ii)1.A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or

B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test; and

2. the mother refused the level of drug treatment recommended by a qualified addictions specialist, as defined in § 5-1201 of this title, or by a physician or psychologist, as defined in the Health Occupations Article;

(iii) the parent subjected the child to:

1. chronic abuse…

\*   \*   \*

(iv) the parent has been convicted, in any state or any court of the United States, of:

1. a crime of violence …

\*   \*   \*

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

(ii) the child's adjustment to:

1. community

2. home;

3. placement; and

4. school;

(iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being.

FL § 5-323(d). The juvenile court considers this extensive list of factors to determine whether terminating a parent's rights is in the best interest of the child—all while giving

17

primary consideration to the health and safety of the child. *Id.* Once the juvenile court has completed this multi-part analysis, if it finds by clear and convincing evidence that "a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist," the juvenile court may terminate parental rights and grant guardianship of the child to another individual. FL § 5-323(b).

### b. *Review of the Factors*

The juvenile court began its oral opinion by extensively discussing the documentary evidence and testimony introduced in the case. The documentary evidence included the many detailed orders that continued T.A. in the custody of DSS, which each contained a review of the case history, detailed findings, and the next steps to be taken in T.A.'s case. The documentary evidence also included voluminous casefiles for both Father and Mother from the FRP, and records of the other services offered to Father and Mother by DSS such as counseling and drug program referrals. It also included detailed "case plans" created by DSS and "recommendations" submitted by the parties that—like the orders described above—included background information on Father, Mother, and T.A., and the next steps proposed to be taken in the case. The testimony introduced in the case and reviewed by the juvenile court included that of Ms. Hemingway (T.A.'s caseworker), Ms. B., and Mother. After reviewing the documentary evidence and testimony, the juvenile court made specific findings as to each of the Section 5-323(d) factors. Below we will quote the juvenile court's oral findings related to each factor.

**"All services offered to the parent before the child's placement by a local department, another agency, or a professional." FL § 5-323(d)(1)(i).**

The first factor requires the juvenile court to review the services that had been offered to the parent before the child's placement, including services offered by DSS or another agency or professional. The juvenile court made the following explicit findings regarding this factor:

o "That even after services were provided for his older sibling, [A.], [T.A.] was born drug-exposed and addicted."

o "The Department had previously worked with the parents in [A.'s] case."

o "The previous service, this is before placement, included housing, transportation and drug treatment referrals."

While discussing the services offered to Father and Mother before T.A.'s birth, the juvenile court did not mention Exhibit 91 at all. Moreover, the court did not implicitly consider any information contained in Exhibit 91, particularly because the information was readily available in the original CINA order, the orders continuing T.A. in shelter care, and the case plans for T.A. There was, therefore, no probability that Exhibit 91 prejudiced the juvenile court's analysis of this factor.

**"[T]he extent, nature, and timeliness of services offered by a local department to facilitate reunion of the child and parent." FL § 5-323(d)(1)(ii).**

This factor requires the juvenile court consider the services provided by DSS to facilitate the reunion of parent and child. The juvenile court considers the extent, nature, and timeliness of those services. Here, the juvenile court found that:

19

- "The Department in [T.A.'s] case again offered appropriate services and referrals to the parents [that] were timely."

- "These services were timely in an effort at reunification."

- "The parents were offered housing assistance, drug treatment, mental health treatment, parenting classes of which they – it is evidenced that they completed and, for Father, anger management."

- "Visitation was offered to parents and occasionally they would visit with [T.A.] unless [T.A. had an] appointment or the parents failed to appear for the visit."

The juvenile court's findings that services were offered in an appropriate and timely manner are supported by ample evidence in the record. Namely, the court's orders continuing T.A. in care describe each of the steps taken by DSS to facilitate the reunion of T.A. with his parents. Additionally, many exhibits summarize the efforts taken to refer Father and Mother to smoking cessation, parenting classes, housing assistance, and anger management. The juvenile court did not explicitly or implicitly refer to Exhibit 91 as it considered this factor and, therefore, there was no probability that Exhibit 91 prejudiced the analysis.

> **"[T]he extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any." FL § 5-323(d)(1)(iii).**

This factor requires the juvenile court to consider whether DSS and the parents have fulfilled their respective obligations under the service agreements. Here, the juvenile court found that:

- "Although a couple of medical appointments were attended by the parents, they missed appointments after having been provided notice of the appointments by the Department of Social Services."

20

- "It is noted there is some evidence that Mother has a part-time job at Taco Bell but there's no evidence of a pay stub to support that claim."

- "Father is unemployed and without housing."

- "[B]ecause of [T.A.'s] chronic pulmonary problems and – that both parents were provided smoking cessation programs. Their toxicologies with regard to the smoking cessation programs indicates that they have not stopped smoking."

After each hearing updating the juvenile court on the status of T.A.'s case, the juvenile court issued an order continuing T.A. in the care of DSS. Those orders describe the failure of Father and Mother to fulfill their obligations and the steps taken by DSS to meet its obligations. The juvenile court's consideration of whether DSS, Father, and Mother have fulfilled their obligations under the service agreements did not require any consideration of Exhibit 91. Exhibit 91 does not address the service agreements or the parties' obligations and, therefore, there was no probability that the admission of Exhibit 91 into evidence could prejudice the juvenile court's analysis of this factor.

> **"[T]he results of the parent's efforts to adjust the parent's circumstances, condition, or conduct to make it in the child's best interests for the child to be returned to the parent's home." FL § 5-323(d)(2).**

The next factor requires the juvenile court to consider the parent's efforts to adjust the parent's circumstances, conditions, or conduct. The focus in this factor is on whether the parents have adjusted their circumstances to make it in the child's best interests to return to their care. Here, the juvenile court found that:

- "The parents have not adjusted their circumstances such that it would be appropriate or safe to return [T.A.] to them in the foreseeable future and the services to them have been exhausted and not without expense."

21

o "During this period when [T.A.] has been in care the parents identified other relatives to care for [T.A.] but they have been ruled out."

o "Having been born drug-exposed with several health conditions and withdrawal problems, notwithstanding his pulmonary issues among others, Mother and Father have not adjusted their circumstances, conduct or conditions to make reunification in [T.A.'s] best interest."

There is clear and convincing evidence to support the juvenile court's findings that Father and Mother failed to adjust their circumstances, condition, or conduct. There was ample evidence in the record regarding Father and Mother's failures to find employment or housing so that they could provide a physical home to which T.A. could return. There was also ample evidence that Father and Mother failed to take parenting and anger management classes or to stop smoking, and, as a result, to make it to be in T.A.'s best interest to be returned to their care.

The evidence reviewed by the juvenile court to determine if Father or Mother adjusted their circumstances to meet T.A.'s needs did not include Exhibit 91. The information regarding attendance to medical appointments can be found in the orders continuing T.A.'s case, Ms. B.'s testimony, and Ms. Hemingway's testimony. The information regarding possible family placements is also found in the court orders, the case plans for T.A., and the recommendations of the parties for the permanency hearings. There was, therefore, no probability that Exhibit 91 prejudiced the analysis of this factor.

**"[I]ncluding… the extent to which the parent has maintained regular contact with 1. the child; 2. the local**

22

**department; 3. if feasible, the child's caregiver." FL § 5-323(d)(2)(i)(1)-(3).**

The next factor continues with the inquiry into whether the parents have adjusted their circumstances and asks the juvenile court to determine the extent to which the parents have maintained contact with the child and DSS. Here, the juvenile court found that:

o "The parents maintaining contact with the worker in this case, that is, the worker for the Department of Social Services, that contact occurred during visits and they had minimal contact with the care givers, other than the contact that … was had at Kennedy Krieger and some of the pulmonology … appointments wherein it was noted that Mother did take some notes and spoke with Mrs. B."

o "So there was some contact at some of the medical appointments. But there is absolutely no evidence that either parent has trained to care for this medically-fragile child."

o "The parent's efforts at visits could be considered somewhat reasonable but their attending medical appointments, completing drug treatment, completing a smoking cessation program and stable housing is rather non-existent."

o "They would not be able to address or handle [T.A.'s] psychological needs or medical needs."

o "And as [T.A.'s] Counsel indicated in her closing statement, quote, … the parents have struggled to the very minimum, end quote, in meeting their own needs."

o "As pointed out by Dr. McGrath, [T.A.] requires a lot of treatment and his, quote, rescue meds, end quote, must be properly administered. The parents do not have any care giving training medically required for [T.A.]."

o "[N]or have [the parents] maintained regular contact with [T.A.'s] care givers."

The juvenile court found that Mother and Father have maintained a minimum level of contact with T.A. and DSS. This finding is supported by evidence in the record outside

23

of Exhibit 91, and, as a result, there was no probability that the admission of Exhibit 91 prejudiced the analysis of this factor. The history of Father and Mother's contact with T.A., DSS, and the B.s is revealed through the testimony of Ms. B., Ms. Hemingway, and Mother, and the orders, reports, and case plans that detail the efforts made by Father and Mother. Although Exhibit 91 discusses Father and Mother's desire to continue to have contact with T.A. generally, and the bonding study is an observation of one of their contacts with T.A., Exhibit 91 is not a record of how Father and Mother maintained contact with DSS, T.A., or the B.s.

> **"[I]ncluding… the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so." FL § 5-323(d)(2)(ii).**

This factor requires the juvenile court to determine if the parent has reasonably contributed to the child's financial support. Here, the juvenile court found that:

- o "There is no evidence of reasonable financial support by the parents for [T.A.'s] care… ."

The record supports the juvenile court's finding that Father and Mother did not contribute to T.A.'s financial support. The juvenile court orders frequently noted that Father and Mother were unemployed. The evidence regarding Father and Mother's lack of financial support is not found in Exhibit 91 and, as a result, Exhibit 91 did not prejudice the juvenile court's analysis of this factor.

> **"[I]ncluding… the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time." FL § 5-323(d)(2)(iii).**

24

This factor requires that the juvenile court take into consideration any parental disability. This factor was not applicable in this case.

> **"[I]ncluding… whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within an ascertainable time not to exceed 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interests to extend the time for a specified period." FL § 5-323(d)(2)(iv).**

The next factor requires the juvenile court to consider whether additional services would result in the child being able to return to the parent within 18 months. Here, the juvenile court found that:

- o "After a review of the testimony and exhibits the Court finds that any additional services offered to the parents would not change their circumstances such that reunification could occur and this case is well beyond the 18-month period after placement."

The juvenile court's findings regarding this factor are more than sufficient. T.A. was taken in by DSS at birth. By the time the juvenile court was determining whether it should terminate the parental rights of Father and Mother, T.A. was just over four years old. The juvenile court noted that the same issues that plagued Father and Mother at the time of T.A.'s birth were the same issues that plagued them four years later. The failure to change over the span of four years was more than sufficient to convince the juvenile court that an additional 18 months would not change the situation.

Although the juvenile court generally referenced "the testimony and exhibits" here, we conclude that the juvenile court's finding may be derived inferentially from all the

exhibits, excluding Exhibit 91 and, therefore, that there was no probability of prejudice from its admission. Father's FRP Casefile printout details his struggle with drug use over many years. The case plans detail the steps Father needed to take, starting in 2012, to stop smoking, stop using drugs, stop drinking, find housing and employment, and complete parenting courses. Subsequent updates to the case plans also reveal that Father had not completed most of those steps. It was logical for the juvenile court to conclude, therefore, based on the FRP Casefile and the case plans, that additional services would not result in reunification within 18 months. Therefore, even though the juvenile court generally referred to "all exhibits," we conclude that there was no probability that Exhibit 91 prejudiced the analysis of this factor.

> **"[W]hether the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect." "[W]hether the parent subjected the child to … chronic abuse." FL § 5-323(d)(3)(i), (iii).**

The juvenile court is also required to consider whether the parent has abused or neglected the child. Here, the juvenile court found that:

- o "[The] Court does not find an issue of chronic abuse or life threatening neglect … ."

T.A. was placed directly with the B.s upon his release from the hospital and has never resided with either of his biological parents. The prior court orders reviewed by the juvenile court did not evidence abuse or neglect charges. Because this factor was inapplicable to T.A.'s circumstances, there was no probability of prejudice.

26

> **"[W]hether… A. on admission to a hospital for the child's delivery, the mother tested positive for a drug as evidenced by a positive toxicology test; or B. upon the birth of the child, the child tested positive for a drug as evidenced by a positive toxicology test." FL § 5-323(d)(3)(ii).**

This factor inquires into whether the child or the mother tested positive for drugs at the time of the child's birth. Here, the juvenile court found that:

- "[T.A.] was born drug-exposed and addicted."

The fact that both T.A. and Mother tested positive for opiates at T.A.'s birth is repeated in numerous exhibits. Almost all of the prior court orders reference this fact, the case plans for T.A. reference this fact, and the recommendations of the parties for the permanency hearings reference that T.A. was born drug-exposed. Although Exhibit 91 does mention in the summary section of Father and Mother's parental fitness evaluations that T.A. was born drug-exposed, Exhibit 91 merely cites the court records already in evidence as the source of that information. We conclude, therefore, that there was no probability that the admission of Exhibit 91 into evidence affected the juvenile court's findings regarding T.A. and Mother's toxicology results.

> **"[W]hether… the parent has been convicted, in any state or any court of the United States, of … a crime of violence." FL § 5-323(d)(3)(iv).**

The juvenile court must also consider whether either parent has been convicted of a crime of violence. Here, the juvenile court found that:

- "There are … no aggravated circumstances nor crimes of violence that apply here."

As this factor is inapplicable to T.A.'s life, there could be no probability of prejudice.

**"[W]hether… the parent has involuntarily lost parental rights to a sibling of the child." FL § 5-323(d)(3)(v).**

The juvenile court must also consider whether the parent has involuntarily lost parental rights to another child. Here, the juvenile court found that:

o "There are [not] … any involuntary termination of previous – involuntary termination of parental rights."

Several exhibits reference the ongoing case of A., T.A.'s older sibling, but the outcome of that case had not yet been determined. Exhibit 91 did not discuss A.'s ongoing case. The juvenile court did not explicitly refer to Exhibit 91, nor could Exhibit 91 have been the source of this information. There was, therefore, no probability that Exhibit 91 prejudiced the juvenile court's consideration of this factor.

**"[T]he child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly; the child's adjustment to 1. community; 2. home; 3. placement; and 4. school; the child's feelings about severance of the parent-child relationship; and the likely impact of terminating parental rights on the child's well-being." FL § 5-323(d)(4)(i)-(iv).**

This final grouping of factors requires the juvenile court to consider the child's connections to those around him or her. This includes the child's emotional ties with the biological parents, with siblings, and with others who significantly affect the child's best interests. Also, the juvenile court must consider the child's adjustment to his or her community, home, placement, and school, and forecast how the child feels regarding the

28

severance of the parent-child relationship, and the likely impact that terminating parental rights will have on the child's well-being. Thus this grouping of factors examines the child's connections to those around him or her.

The only time in its entire analysis that the juvenile court explicitly commented on Exhibit 91 was in its analysis of this final grouping of factors. The juvenile court found that "[p]er the bonding studies and the testimony of the case worker, Ms. Hemingway, [T.A.] is … bonded to his care givers and the care givers have become his parents." The juvenile court then found that:

- o "To change his current living situation per the testimony quote, they would have to restart the process."

- o "That is, uprooting [T.A.], per this Court's findings, would be detrimental to his best interest and particularly detrimental to his physical status considering his physical fragility and vulnerability."

- o "He is bonded and secure with his care givers."

- o "He has adjusted to home, community, school and placement."

- o "He has a foster brother."

- o "He attends the YMCA."

- o "He does well academically."

- o "He is nurtured and stable with all of his extensive medical needs met – being met by his care givers who take him to and from his many medical appointment."

- o "The Court finds that [T.A.'s] feelings regarding severance of the parental relationship practically does not exist."

- o "He does not have any feelings regarding severance, as the care givers, who he calls Mom and Dad, are the only parents that he has known since he was five days old."

29

o "[T.A.] will be 5 years old in two months."

We hold that the juvenile court's findings for this group of factors were supported by clear and convincing evidence *outside* of Exhibit 91. We come to this conclusion, even though the juvenile court expressly referenced the bonding studies in Exhibit 91, because the basis for the juvenile court's findings may be found either in the testimony of Ms. Hemingway or Ms. B., or can be inferred from the record as a whole outside of Exhibit 91. To explain our conclusion, we will discuss the findings that could be, *first*, attributed to the testimony of Ms. Hemingway; *second*, attributed to the testimony of Ms. B.; and *finally*, inferred from the testimony and the record in general.

*First*, several of the juvenile court's findings for this group of factors are taken from the testimony of Ms. Hemingway. Ms. Hemingway testified that when T.A. was younger and first started visits with Father and Mother, T.A. "would hang up under me, you know, until he got, you know, used to them." Ms. Hemingway also testified that after Father and Mother were released from incarceration, T.A.'s relationship with them had to "start all over again." In regard to the B.s, Ms. Hemingway testified that T.A. responds to them "[a]s Mom, Dad. It's a loving, healthy, caring relationship. … [H]e interacts well with them." As a result, from Ms. Hemingway's testimony the juvenile court was able to find that T.A. is "bonded and secure with his care givers," that changing T.A.'s living situation would require that they "restart the process," that T.A. is "adjusted to home, community, school and placement," and that he is "nurtured and stable." Thus, much of the juvenile court's findings for this factor can be directly attributed to Ms. Hemingway's testimony.

*Second*, support for another portion of the findings made by the juvenile court is found in the testimony of Ms. B. For example, Ms. B. testified that T.A. refers to her and her husband as Mom and Dad. Ms. B. testified about T.A.'s daily activities such as school, after school activities, family activities, and medical appointments. Ms. B. also testified about T.A.'s interactions with the B.'s extended family and how T.A. initiates phone calls and video chats with the extended family. From Ms. B.'s testimony, the juvenile court could find that T.A. is bonded to his care givers, is "adjusted to home, community, school and placement," has a foster brother, attends the YMCA, does well academically, that the B.'s meet his extensive medical needs and take him to medical appointments, and that he calls the B.'s Mom and Dad. Thus, much of the juvenile court's findings for this factor can be attributed to the testimony of Ms. B.

*Finally,* the remaining findings that were not taken directly from the testimony of Ms. Hemingway or Ms. B., can be inferred from the record as a whole, without reference to Exhibit 91. That T.A. does not have any feelings regarding severance of the parental relationship may be inferred from T.A.'s age, from the fact that he calls the B.s Mom and Dad, and from the fact that he has only ever resided with the Bs. Likewise, the finding that T.A. does not have feelings regarding severance of the parental relationship may also be inferred from his age and from the testimony of Ms. B. that he does not talk about Father and Mother after visits. Thus, the findings that are not directly taken from testimony may be discerned from the context of the record as a whole, without reference to Exhibit 91.

31

In conclusion, although the juvenile court prefaced its findings by stating, "per the bonding studies and the testimony of the case worker," we conclude that there was sufficient testimony for the juvenile court to make the same findings without a need for Exhibit 91. The testimony of Ms. Hemingway, the testimony of Ms. B., and the context of the record as a whole, provided sufficient evidence for each of the findings discussed above without reference to Exhibit 91. As a result, we conclude that there was no probability that the juvenile court's consideration of Exhibit 91 prejudiced its analysis of this grouping of factors either.

### c. *Termination of Parental Rights Factors Collectively*

The juvenile court must give "primary consideration to the health and safety of the child" and then give "consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests." FL § 5-323(d). Thus, the juvenile court must keep in its mind the health and safety of the child, and then balance all of the factors previously discussed to determine if the termination of parental rights is in the child's best interest. Even though the factors discussed in the previous section are individually important, the collective weight of the factors allows the juvenile court to determine the child's best interests. Ordinarily, if the health and safety of the child and the child's best interests both weigh in favor of termination, the juvenile court will not err or abuse its discretion by terminating parental rights.

We conclude that there was no probability that the admission of Exhibit 91 into evidence prejudiced the juvenile court's finding that T.A.'s best interests was to terminate

parental rights. During its analysis of all the factors, the juvenile court explicitly referenced Exhibit 91 one time. That reference was only in passing, "per the bonding studies and the testimony of the case worker," and, as explained above, the findings were backed by other testimony. The one-time observation of T.A. with the B.s and with his Father and Mother was unique to Exhibit 91. But the general discussion of the level of bonding he had with the adults, was not unique to Exhibit 91. The record contained exhibits showing the entire history of the case and the years of bonding that T.A. had with the B.s but not with Father and Mother. We conclude, therefore, that there was no probability that the admission of Exhibit 91 prejudiced the juvenile court's analysis of T.A.'s best interests and that its admission was harmless error.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**